IN THE MATTER OF THE TRUST CREATED BY
FRIEDA LOHSE, GRANTOR.

Superior Court of New Jersey
Chancery Division

Decided January 5, 1965.

*Messrs. Hannoch, Weisman, Myers, Stern & Besser,* attorneys for plaintiffs-trustees (*Mr. William S. Myers* appearing).

*Messrs. Budd, Larner & Kent,* attorneys for defendants Henry Lohse, Jr., Henry Lohse, III, William Lohse, James N. Hanson, Louise Hanson, Rose Schwarz, Donald Schwarz, L. Clark Ganssle, Ruth Ganssle and Elsie Giller (designated as Mrs. Wadsworth Giller) (*Mr. Samuel A. Larner* appearing).

*Messrs. Grosso, Beck & Mangino,* attorneys for defendants Wheat Ridge Foundation, Grace Evangelical Lutheran Church (Missouri Synod), Lavelle School for the Blind, Vocational Foundation, Inc., The Lutheran Children's Home of the South, The Lutheran School for the Deaf of Detroit, Michigan, and Trinity Lutheran Church, St. Petersburg, Florida (*Mr. Marius Grosso* appearing).

HERBERT, J. S. C. Plaintiffs are trustees of a trust created by Mrs. Frieda Lohse during her lifetime. The instrument of creation was an *inter vivos* trust agreement dated April 7, 1956, to which four amendments were executed prior to the death of Mrs. Lohse on July 2, 1961. The complaint presents plaintiffs' first intermediate account for approval and also

contains counts seeking other relief. The questions about to be considered arise out of the third count, which alleges that plaintiffs are confronted with problems of distribution.

Two tracts of land in Florida are major assets of the trust. They contain a total of 340 acres, and since the death of Mrs. Lohse down to the present time have not been salable at prices which plaintiffs and other interested parties would regard as adequate. Plaintiffs have on hand other assets which are more liquid and are available to some extent for distribution now, but these fall far short of the total amount required to satisfy in full the list of distributive provisions found in article FIRST of the trust agreement as amended. There is a possibility that the sale of the Florida land, when accomplished, will not produce a fund large enough, when added to other available assets, to pay all distributive provisions in full, and if so, some appropriate scheme of abatement will have to be followed. Article FIRST contains a subparagraph reading in part as follows:

"(R) If the principal of the trust estate at the date of the death of the Grantor, as it may be augmented by any payment provided for in the Grantor's Last Will and Testament, shall be insufficient to make all of the payments provided for in paragraphs (A) through (D) and (F) through (P) of this Article FIRST, I direct (1) that the payment provided for in paragraph (A) (or paragraph (B), as the case may be) shall be preferred over all other payments contained in this Article FIRST; (2) that thereafter payments provided for in paragraphs (C) and (D) shall have preference over the payments provided for in paragraphs (F), (G), (H), (I), (J), (K), (L), (M), (N), (O) and (P), but the payments provided for in paragraphs (C) and (D) shall have no preference *inter sese* but shall be abated ratably, if necessary; * * *."

This language is followed by similar language directing that preference be given to certain other designated payments over payments listed after them.

Should the abatement schedule of subparagraph R (quoted in part above) be applied to whatever distribution the trustees determine can be made at this time with funds now on hand? For most of the members of the lowest group in that

schedule it is argued that subparagraph R does not apply at all because there was no insufficiency of assets at the death of Mrs. Lohse, and moreover, the subparagraph should not be applied to a proposed partial distribution when it is unknown whether the future sale of the Florida land will produce a surplus or deficiency. Mrs. Lohse, as already noted, died on July 2, 1961, and the termination of her life estate in the trust brought the trustees face to face with the duty to liquidate and distribute. For estate tax purposes the 340 acres of land in Florida were appraised at $576,000 as of the date of death. The grand total of all the distributive shares listed in article FIRST of the trust agreement as amended is $575,000. If the land could have been sold promptly after Mrs. Lohse's death for the appraised value, and the sale price added to other assets of the trust, plaintiffs would have had enough to pay out the total of $575,000 without any abatement of any of the shares. It can be hoped that the land will in time bring enough to pay all shares in full, yet no one can be sure. The beneficiaries who are at the end of the abatement scale of subparagraph R contend that the language used in that paragraph makes it necessary to treat the appraised value of the land as though it were an actual sale price, that there was no insufficiency of assets "at the date of the death of the Grantor," even though an insufficiency may develop in the future, and therefore the condition to which subparagraph R expressly is made subject never became applicable. After reading the first few lines of subparagraph R it must be conceded that this argument has some persuasiveness. However, it is not persuasive enough to offset the thought that a person who is providing for the disposition of property after his death is unlikely to attach a literal meaning to the phrase "at the date of death" or any similar phrase. His knowledge of ordinary affairs would tell him that some period of administration would have to be involved. Here the trust instrument confirms that Mrs. Lohse was thinking of a necessary period of liquidation. In subparagraph S of article FIRST there is an express authorization to the trustees to delay dis-

tribution if the trust estate is not liquidated or otherwise susceptible to a convenient division.

My conclusion is that subparagraph R of article FIRST should be construed as though it had been written substantially as follows:

"If the principal of the trust estate, by the time the trustees in the proper discharge of their duties have placed it in distributable form, shall be insufficient (after taxes, administration expenses, etc.) to make all of the payments provided for in paragraphs (A) through (D) and (F) through (P), then the following schedule of abatement shall apply * * *."

Such construction is within the principles laid down in *Fidelity Union Trust Co. v. Robert*, 36 *N. J.* 561 (1962), especially the comments to be found at *pages* 565 and following. Although the court was there dealing with a will rather than an *inter vivos* trust agreement, that factual difference is not significant. Here Mrs. Lohse has made a *post mortem* distribution of her property, and the practical problem of construction is the same as it would have been if subparagraph R had been included in her will. The applicable guides should, therefore, be the same.

Plaintiffs have presented more than a hypothetical question. They have a real and present problem because some assets are now available for distribution. It is not an appropriate solution to hold all funds and pay no one until such time as the Florida land is sold and the ultimate financial result is known. With total distribution not being feasible for a time, plaintiffs should be able to make partial distribution. To place them in a position to do so in a manner consistent with the terms of the trust instrument, it has been necessary to construe the over-all effect of subparagraph R though the sale price of the land may ultimately be high enough to eliminate any problem of abatement. A somewhat similar situation was presented in *First Portland Nat'l Bank v. Rodrique*, 157 *Me.* 277, 172 *A. 2d* 107 (*Sup. Jud. Ct.* 1961). There the court decided, among other things, that current and future problems were so inter-

mingled in the situation before it as to call for a ruling without waiting for the resolution of contingencies of fact.

The construction given above to subparagraph R of article FIRST, as amended, requires that any partial distributions which the trustees see fit to make at this time or in the future shall be subject to and governed by the abatement schedule contained in that subparagraph.

For convenience the Florida lands have been referred to as though owned directly as trust assets. The moving papers make it clear that plaintiffs are in the process of dissolving a corporation, wholly owned by them, which has held the titles.

One of the arguments advanced against applying the abatement schedule of subparagraph R to the proposed partial distribution was that such result would in some fashion relieve the trustees for the future of doing their duty to manage and dispose of trust assets. There is no merit in the argument, but since it has been made, it is perhaps advisable to declare that plaintiffs will be obligated to discharge their trustees' duties under the trust instrument and the law just as fully hereafter as they have been heretofore.

Plaintiffs also ask for a ruling about the proper method of paying commissions. Article TENTH of the trust instrument, after providing for the payment of commissions on income, states, "On disbursement of principal funds as directed in the trust, the Trustees shall deduct and retain commissions at the rate of 5% of such principal funds disbursed, such commissions to be divided between them." This sentence serves two purposes. It fixes the rate of commissions on principal and provides that the time of their payment shall coincide with actual distribution. Does it also call for the deduction of 5% from the sum which is provided for each beneficiary in article FIRST of the trust instrument? I think not. This answer follows from the construction already given to subparagraph R.

Where a trust instrument says nothing at all about commissions on principal, a trustee ordinarily becomes entitled to them at an appropriate point in his work, and the balance

of assets available for ultimate distribution will be reduced by the amount of the commissions. If the estate is insufficient to pay all beneficiaries in full and there is an abatement schedule —as here—then the specified abatement will be applied to the fund left after the commissions have been paid. A settlor or testator can depart from this general rule by a sufficient statement to that effect. However, the wording of article TENTH, as quoted above, is at most a mere suggestion that each distributive share should have 5% deducted from it, and such suggestion, if present at all, is not clear enough to call for a deviation from the general rule.